STATE OF CONNECTICUT *v.* ARMAND LARIVIERE

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. MV 11-3840

Argued July 1—decided August 26, 1963

*Irwin I. Krug,* of Willimantic, for the appellant (defendant).

*Philip M. Dwyer,* prosecuting attorney, for the appellee (state).

Jacobs, J.  The defendant was charged with, tried to the court for, and convicted of, the offense of operating a motor vehicle while he was under the influence of intoxicating liquor, in violation of § 14-227 of the General Statutes, and he has appealed upon the sole ground that the court erred "[i]n concluding upon all the evidence that the defendant was guilty [as charged] beyond a reasonable doubt."

The record before us shows that the defendant was arrested on December 31, 1962, at approximately 4:30 p.m.  Chief Rose of the Willimantic police department, responding to an emergency radio call, proceeded at once to the Railroad Street municipal parking lot in the city of Willimantic. Upon his arrival there, he observed that a station wagon had rolled out of a parking stall and was obstructing traffic in the traveled portion of the parking lot.  The defendant was slumped over the front seat either asleep or in a stupor.  His hips and buttocks were resting on the driver's side of the front seat of the car; his head and the rest of his body were slumped horizontally on the front seat and generally to the right of the driver's side.  His extremities were under the wheel near the controls, but not on the controls.  The defendant was alone in the automobile.  The engine was running.  Two unopened bottles of wine were found in the vehicle.

Chief Rose attempted to arouse the defendant but did so only after some difficulty.  The defendant had to be assisted out of the station wagon.  He was unsteady on his feet, his breath smelled of alcohol and his eyes were bloodshot.  His speech was "rather slow and somewhat thick."  With some assistance, he was escorted into the chief's cruiser and taken to police headquarters.  There, Sergeant Haddad

administered the usual tests to determine the defendant's sobriety. The officer observed that the defendant's face was "very flushed," his eyeballs were red, and he was unable to walk in a straight line. The defendant admitted to the police that he had had "four or five bottles" of beer between 3 and 4 o'clock that afternoon on Railroad Street. Chief Rose and Sergeant Haddad were both of the opinion that the defendant was under the influence of intoxicating liquor and unfit to operate a motor vehicle. The defendant voluntarily submitted to a blood test. A blood specimen was taken at headquarters at 5:16 p.m. by Dr. Basden and transmitted to the state toxicologist for analysis. The blood alcohol content (quantitative dichromate method) was 0.16 of one percent by weight of blood.

In *State* v. *Saunders*, 2 Conn. Cir. Ct. 207, we pointed out: " 'Settled medical opinion apparently is that any person is unfit to drive when his blood alcohol concentration is at or in excess of fifteen hundredths of one per cent.' *State* v. *Hunter*, 4 N.J. Super. 531, 534; Uniform Chemical Test for Intoxication Act § 7, 9 U.L.A. (Sup. 1962); see Proc. of House of Delegates, Am. Med. Assn., June 8-12, 1944. 'The standards of the American Medical Association fulfill adequately the purpose they were designed to serve, namely, to provide a scientific yardstick of reasonable accuracy for evaluating the condition of a person accused of driving a motor vehicle while "under the influence of intoxicating liquor." They are also practical and fair, even generous.' Letourneau, 'Chemical Tests in Alcoholic Intoxication,' 28 Can. B. Rev. 858, 864; see commissioners' prefatory note, Uniform Chemical Test for Intoxication Act." And to this we may add: "A blood alcohol figure of 150 milligrams per 100 cubic centimeters of blood (or 0.150 per cent by weight) is considered indicative of intoxication because practically everyone

shows at that level sufficient deterioration of judgment and interference with neuro-muscular coordination to be a menace to himself and to others." Ladd & Gibson, "Legal-Medical Aspects of Blood Tests to Determine Intoxication," 29 Va. L. Rev. 749, 752; see Rabinowitch, "Medicolegal Aspects of Chemical Tests of Alcoholic Intoxication," 39 J. Crim. L., C. & P.S. 225, 244. The court was justified upon all the evidence in resolving the disputed issue of intoxication against the defendant.

The defendant's argument, in the main, is that the evidence does not show that the defendant was "operating" the car within the meaning of the statute. He relies upon *State* v. *McDonough,* 129 Conn. 483, to secure a reversal of his conviction. In the *McDonough* case, there was evidence that the defendant was under the influence of liquor when he was found in a stationary automobile; there was no direct evidence that he was or had been driving the car. These additional facts appear in the *McDonough* case: (1) A policeman saw an automobile at about 9:30 p.m. in a ditch on the right-hand side of the road, with a wheel over the wire of a fence; (2) the motor was not running; (3) it was dark and the headlights were lighted; (4) the defendant was seated in the middle of the front seat, leaning towards the right, with one hand on the floor and the other on the dashboard, as though he was reaching or feeling for something; (5) there was no evidence (a) as to how long the car was standing, (b) as to who owned it, (c) that the defendant had been driving the car prior to the occurrence, (d) that he could drive a car, or (e) as to whether he had a driver's license. In reversing the conviction, the court held (p. 486): "We conclude that the evidence in the instant case does not exclude every reasonable supposition of the innocence of the defendant. A rational and reasonable conclusion

would be that another person had driven the car and had gone to secure assistance in extricating the wheel from the wire. It follows that the evidence offered by the state, in and of itself, is insufficient to support the conviction of the defendant." See *State v. DeCoster*, 147 Conn. 502 (conviction reversed, *Baldwin, C. J.*, dissenting); *State v. Hall*, 271 Wis. 450 (conviction reversed, *Fairchild, C. J.*, dissenting).

Many authorities have attempted to interpret the meaning to be given to the term "operating" as used in statutes of the kind under consideration here. See 5A Am. Jur., Automobiles and Highway Traffic, § 1162; 61 C.J.S., Motor Vehicles, § 628; 8 Blashfield, Automobile Law and Practice (Perm. Ed.) § 5393; Berry, Automobiles (7th Ed.) § 5.386; note, 47 A.L.R.2d 570, 577. We do not undertake to give the term a definition which would be applicable to all situations, nor are we required to decide where the line shall be drawn between acts which constitute "operation" and those which do not. "[T]he well considered and reasoned cases sustain the view that a person may be convicted of 'operating' a motor vehicle while under the influence of intoxicating liquor without it necessarily being shown that the automobile was actually in motion or even had the engine going; in short, circumstantial evidence will show that the accused was 'operating' the motor vehicle while under the influence of intoxicating liquor." *State v. Pritchett*, 53 Del. 583, 593; see *State v. Kreske*, 130 Conn. 558, 563; *State v. Webb*, 78 Ariz. 8; *State v. Hazen*, 176 Kan. 594; *State v. Damoorgian*, 53 N.J. Super. 108; *State v. Baumgartner*, 21 N.J. Super. 348; *State v. Haddock*, 254 N.C. 162.

In the instant case, the following facts were obvious to Chief Rose when he arrived at the municipal

parking lot on Railroad Street at 4:30 p.m. on December 31, 1962: (1) The station wagon was in a stationary position in the middle of the parking lot; (2) it had rolled out of a parking stall; (3) it was in a hazardous position; (4) it was obstructing traffic; (5) the engine was running; (6) the defendant was seated in the driver's seat, and the rest of his body was lying across the front seat in the direction of the passenger's side; (7) no one else was in the car; (8) the defendant was aroused only after some difficulty. Chief Rose found the defendant in a position in the driver's seat which would make it impossible for another person to get into that seat. His legs and feet were near the controls, the motor was running, and the car was standing in the middle of a public parking lot. "Defendant's car didn't reach the position where it was found by some magical process; no figure from outer space dropped it from the sky to . . . [the middle of the parking lot], where it was found . . . ; it had to have been 'operated' by someone to get it to the place where . . . [Chief Rose] found it, with defendant in it. The evidence clearly indicated it was practically, if not wholly, impossible to conceive that any person, other than the defendant, could have gotten into the driver's seat, manipulated the gears and driven it to the spot where it was found, with the defendant sitting as he was in relation to the driver's seat and with his feet situated as they were." *State* v. *Pritchett,* supra, 598. It seems to us that the facts in this case go beyond those in the *McDonough* and *DeCoster* cases.

We think that at the time the state rested its case, a prima facie case against the defendant had been established. "[T]he evidence produced by the state was sufficient to suggest the need of some denial or explanation by the defendant himself." *State* v. *Nelson,* 139 Conn. 124, 127. The defendant chose

neither to take the stand nor to offer any evidence in his behalf. "The evidence warranted a finding that the state had made out a prima facie case of guilt, that is, a case where 'the evidence indicates to a reasonable person such a strong probability of guilt that a denial or explanation is reasonably called for.' . . . The court did not err in concluding, upon all the evidence, that the defendant had been proven guilty, beyond a reasonable doubt, of the crime as charged." *State* v. *DelVecchio,* 145 Conn. 549, 553.

There is no error.

In this opinion PRUYN and KINMONTH, Js., concurred.